EDWIN T. BULL, Plaintiff-Appellant and Counterdefendant, *v.* GEORGE MITCHELL *et al.*, d/b/a Morris Harbor Service, Defendants-Appellees and Counterplaintiffs.—(Iowa Marine Repair Corporation, Plaintiff-Appellee, *v.* Edwin T. Bull *et al.*, Defendants-Appellants.)

Third District   Nos. 82—336, 82—343 cons.

Opinion filed April 29, 1983.

178

Robert Morel Gray and Andrew J. Kleczek, both of Gray, Kleczek & Kielian, P.C., of Joliet, for appellants.

Joseph M. Cernugel, of Cirricione, Block, Krockey & Cernugel, P.C., of Joliet, for appellee Iowa Marine Repair Corporation.

JUSTICE BARRY delivered the opinion of the court:

Plaintiff, Edwin T. Bull, Sr., appeals from judgment entered by the circuit court of Will County dismissing two counts of his com-

plaint against defendant, Iowa Marine Repair Corporation, and entering judgment against him in Iowa Marine's complaint to foreclose lien. The subject of these consolidated actions is an 80-foot fishing trawler named Bull Head, which was built by Bull in 1961. In July of 1974, Bull leased the Bull Head to George Mitchell and Ralph Hix. At that time, the Bull Head was in excellent condition, having recently been completely overhauled. The parties' lease was an "evergreen" arrangement for an indefinite period, terminable at the election of either party.

On June 20, 1976, the lease was terminated. The Bull Head, which had been used by Hix Wrecking Company on a job in Pekin, Illinois, dismantling a bridge over the Illinois River, was towed upriver to Morris, Illinois, no longer operating on its own power. Jerry Stanton, an employee of Hix Wrecking, rode the vessel from Pekin to Morris where he was to turn it over to Les Doyle, an employee of Bull, pursuant to Bull's instructions. Doyle was staying by a scrapyard operated by Charles Schopf on the south side of the river, just across from Iowa Marine's offices on the north side. About 1,000 feet downriver from the scrapyard, the Bull Head was met by a harbor tug called the Maryellen. The Maryellen was owned by Iowa Marine. Bill Brown, an employee of Iowa Marine, piloted the Maryellen and switched the Bull Head, removing it from tow and moving it upriver towards the south bank where it was tied off per Stanton's orders.

The next day, Stanton and Doyle moved the Bull Head a short distance back downstream and tied it to a barge owned by Bull named the Shaun Rue. The Bull Head remained on the south shore of the river until December of 1976, when Doyle found it grounded. Doyle hired Dennis Rapp, an independent diver and marine salvage man, to lift the vessel up to free it and move it to deeper water. Rapp did so after first clearing the deal for his services with Bull. Shortly thereafter, Iowa Marine moved the Bull Head from the south shore of the river to the north shore, where Iowa Marine maintained its regular fleeting operations.

The Bull Head has remained in the same general vicinity of the north bank of the river in Morris, in a greatly deteriorated condition, ever since. Iowa Marine sent billing statements for their services to Bull's place of business in Joliet, and, when Bull refused to pay the amount demanded for switching, fleeting and other services rendered on behalf of the Bull Head since June 20, 1976, Iowa Marine initiated proceedings to claim a lien on the vessel and to foreclose thereon. Iowa Marine's claim for lien on watercraft was filed in Grundy County on May 6, 1977. Its complaint to foreclose lien was also filed

in Grundy County and is dated August 25, 1977.

Meanwhile, on February 22, 1977, plaintiff Bull had instituted a multicount complaint against Iowa Marine, George Mitchell and Ralph Hix claiming, *inter alia*, damages for conversion of the Bull Head and, in the alternative, for wrongful detention of the Bull Head. Bull's complaint was filed in Will County. On May 27, 1977, Iowa Marine answered Bull's complaint and filed a counterclaim praying for personal judgment against Bull for the value of services performed on behalf of the Bull Head. By order of July 25, 1980, Iowa Marine's cause of action was transferred to Will County for consolidation with the suit initiated by Bull.

A bench trial was held March 18, 1982, through March 23, 1982. On April 13, 1982, the trial court entered an order which was subsequently modified by supplemental orders of April 22 and May 10. For the purposes of the matter presently before us, the court held: (1) that Iowa Marine had not wrongfully detained or converted the Bull Head; and (2) that Iowa Marine was entitled to a lien on the Bull Head in the amount of $31,612.50 for labor and services rendered on behalf of the vessel from June 20, 1976, to the time of trial. The court entered judgment for Iowa Marine and against Bull in the amount of $31,612.50 and "[i]n the event that Defendant *** has not paid to Plaintiff [said] sum," judicial sale of the Bull Head was ordered together with deficiency judgment against Bull. It is from the entry of these judgments that the instant appeal arises.

With respect to Bull's suit against Mitchell and Hix, the court generally found the issues in favor of Bull (since Ralph Hix had never been served with process, no judgment was entered against him), and entered judgment against Mitchell. Mitchell appealed from the entry of judgment against him as well. However, at oral argument the parties to that appeal (Bull and Mitchell) gave notice to this court that they were stipulating to vacatur of the trial court's judgment insofar as it affected claims against each other and dismissal of the counts upon which that judgment was founded. We have dismissed Mitchell's appeal accordingly and will not consider the issues raised therein.

In the appeal before us, Bull contends that the findings of the trial court were contrary to the manifest weight of the evidence. With respect to the court's denial of the relief sought on Bull's conversion and wrongful detention counts, Bull asserts that the court's factual findings are unsupported by the record and that the court was "confused as to the law." We disagree.

■■ Both conversion and wrongful detention actions are premised on *wrongful* deprivation of property from the person entitled to pos-

session. (*Kunde v. Biddle* (1976), 41 Ill. App. 3d 223, 353 N.E.2d 410; *Mineika v. Union National Bank* (1975), 30 Ill. App. 3d 277, 332 N.E.2d 504.) Proof of a valid possessory lien on the property in question may operate to defeat either action, inasmuch as it renders the defendant's possession lawful.

The right to a lien for labor, material, or services arises upon the furnishing of such labor, material, or services and by force of a statute, an express contract, an implied contract or the usages of trade or commerce. (*Deitchman v. Korach* (1947), 330 Ill. App. 365, 71 N.E.2d 367.) The right to retain possession of the property to enforce a possessory lien continues until such time as the charges for such materials, labor and services are paid. *Knapp, Stout & Co. v. McCaffrey* (1899), 178 Ill. 107, 52 N.E. 898.

In the present case, it is unquestioned that Iowa Marine performed valuable switching services for the benefit of the Bull Head on June 20, 1976, at the request of Jerry Stanton who was at that time in lawful possession of Bull's property.

■ On appeal, Bull takes the position that Iowa Marine was required to establish its *exclusive* possession of the south bank property in order to prevail on its claim of lien for the period between June 20, 1976, and December 1976, when the Bull Head was moved to the north bank. Such, however, is not a correct assessment of the law of Illinois. Rather, as Iowa Marine correctly asserts, the fleeting company is properly considered in possession for purposes of creating and maintaining a lienhold interest for a period when a vessel is tied to real property leased or owned by the lienholder in the absence of evidence that the vessel's owner had a superior interest in the real estate. Compare *L & LC Trucking Co. v. Jack Freeman Trucking Co.* (1976), 36 Ill. App. 3d 186, 343 N.E.2d 716 (owner of a truck established existence of an oral lease of space on a garageman's property, thus defeating garageman's right to lien for storage).

According to Oliver Brown, manager of Iowa Marine's operations in Morris during the period in question, he paid $400 per month rent to Bob Biley for the use of the property on the south bank of the river where the Bull Head was docked on June 20. To Brown's knowledge, Biley owned the leased property. As evidence of the rental agreement, Iowa Marine produced checks, one of which was admitted into evidence at trial. This check was made payable to Mr. Biley in the amount of $400 and was annotated "for April fleeting." According to Brown, the leasing agreement between Biley and Iowa Marine was oral, rather than written. In addition, Ed Sabinske, testifying on behalf of Bull, stated that he had lived in a trailer parked on the

south side of the river in 1976. To his knowledge, the land in the immediate area was owned by Bob Biley.

In contradiction to Iowa Marine's assertion of a leasehold interest in the south bank property was testimony by Charles Schopf, a witness called by Bull. Schopf testified that he ran a scrap operation on the south bank property in question during the period when the Bull Head was docked there. Schopf stated that the land was owned by "River Enterprises" and that he had occupied it "with their consent." There was no evidence introduced at trial to corroborate either Schopf's property interest in the south bank or who owned River Enterprises.

The trial court found that "[t]he evidence preponderates that Iowa Marine held possession, under lease from the owner, of the area where the Bull Head was tied initially, and where the Bull Head was tied shortly thereafter." While the evidence of Iowa Marine's leasehold interest in the south bank property was not overwhelming and unambiguous, it was sufficient proof under the applicable preponderance-of-the-evidence standard to support Iowa Marine's position. Testimony of Ed Sabinske tended to corroborate Iowa Marine's assertion that the south river bank property in question was owned by Bob Biley. Although Chuck Schopf testified that River Enterprises owned the land, he failed to state that Bob Biley did not represent River Enterprises. Further evidence of Iowa Marine's leasehold interest was the $400 cancelled check for April rent made payable to Biley. We are unable to discern any indication that Bull had a superior proprietary interest, or, indeed, any proprietary interest whatsoever in the south bank. We hold that the evidence of record supports the trial court's conclusion that Iowa Marine had a leasehold interest in the south bank of the river where the Bull Head was tied until December of 1976.

■ Bull's alternative position is that, even if the south bank were subject to Iowa Marine's possessory interest, the evidence does not support the trial court's conclusion that Iowa Marine was in possession of the Bull Head itself during the period from June 20, 1976, to December when it was finally moved to the north bank. Appellant's argument is without merit. The mere fact that Jerry Stanton may have spent some time on board the vessel while it lay on the south bank will not thereby defeat Iowa Marine's right to a possessory lien. See *Nathan M. Stone Co. v. Ellerson* (1923), 230 Ill. App. 593 (garage owner's possessory lien not lost when the truck was temporarily towed out of garage to start the motor with the owner driving it).

There is no dispute that Iowa Marine retained possession of the

Bull Head from December of 1976, when Iowa Marine moved the vessel to the north shore and kept it in Iowa Marine's regular fleeting operation, until the time of trial. The evidence is in conflict as to whether or not Bull attempted to regain possession of the Bull Head in December. At trial, Bull testified that he had demanded of a "Mr. Brown" at Iowa Marine's place of business that the Bull Head be returned to him. Oliver Brown, by contrast, testified on behalf of Iowa Marine that he had not spoken with Bull in December of 1976. The trial court found that "no effort was made to regain the possession of the Bullhead until the trial of this cause." Issues of credibility of witnesses are properly resolved in the trial court. On the record before us, there is no basis for disturbing the trial court's conclusion that the Bull Head was continuously in the possession of Iowa Marine from June 20, 1976, to the time of trial.

There was ample testimony elicited at the trial of the instant action to support a finding that the switching and fleeting services performed by Iowa Marine on June 20, 1976, and thereafter on behalf of the Bull Head were customarily provided vessels at the instance of the person in possession thereof and on the credit of the vessel itself. While the reasons for denying Bull's claims against Iowa Marine as stated in the trial court's order are not entirely clear, this court will not upset a judgment entered by the trial court where the result reached is supported by the record even if the reasons provided therefor may be in error. Having found that the trial court's conclusions respecting Iowa Marine's assertion of lawful possession are not contrary to the manifest weight of the evidence, we affirm that portion of the trial court's judgment denying Bull's claims for conversion and wrongful detention and turn our attention to Bull's arguments respecting the trial court's award of judgment in favor of Iowa Marine on Iowa Marine's complaint for foreclosure of lien.

Iowa Marine's original action sought to foreclose a mechanics' lien on watercraft (Ill. Rev. Stat. 1975, ch. 82, par. 37) for towing and switching services, maintenance, fleeting and storage provided for the benefit of the Bull Head since June 20, 1976. In addition to its request that the court order the Bull Head sold to satisfy the lien, Iowa Marine requested a personal judgment against Bull for the deficiency in the event sale of the watercraft produced less than the amount of the lien. In Iowa Marine's countercomplaint, the fleeting company sought a personal judgment against Bull in the full amount of the lien claimed in the lien foreclosure suit, alleging that Bull's duty to pay arose under "an oral agreement whereby [Iowa Marine] would tow [the Bull Head] to safe moorings and store or 'fleet' such vessel, as

was the custom and practice and [Bull] would pay to [Iowa Marine] for such services, a fee as was reasonable in the trade."

On appeal, Bull argues that the trial court's conclusion that Iowa Marine was entitled to relief is contrary to the manifest weight of the evidence. Iowa Marine's right to foreclosure on its lien on the Bull Head by judicial sale arose, if at all, by statute. Our first inquiry, therefore, is what statutory authority exists for the lien claimed by Iowa Marine. Iowa Marine's initial claim for lien and its brief on appeal both refer us to "An Act relating to contractors' and material men's liens, known as mechanics' liens" (Ill. Rev. Stat. 1977, ch. 82, pars. 1 through 39). This act specifically provides in section 19 for a deficiency judgment in the event the sale of the property subject to the lien is insufficient to satisfy the amount of the lien. The rule that this act must be strictly construed is by now well established (*Robinette v. Servite Fathers* (1977), 49 Ill. App. 3d 585, 364 N.E.2d 679); therefore, we proceed with caution in ascertaining whether Iowa Marine has brought itself within the confines of the act such that it is entitled to the extraordinary relief afforded thereby. Section 37 of the act provides in pertinent part:

> "Any architect, contractor, sub-contractor, materialman, or other person furnishing services, labor or material for the purpose of or in constructing, building, altering, repairing or ornamenting a boat, barge or other water craft, shall have a lien on such boat, barge or other water craft for the value of such services, labor or material in the same manner as in this act provided for services, labor or material furnished by such parties for the purpose of building, altering, repairing or ornamenting a house or other building ***." Ill. Rev. Stat. 1977, ch. 82, par. 37.

We are aware of no cases in which material, labor and services rendered on behalf of a vessel for the purposes of merely maintaining and storing it have been held sufficient to entitle the person or entity furnishing such material, labor and services to a mechanics' lien under this statute. We have read the record in this case thoroughly and find that the evidence affirmatively discounts any argument that Iowa Marine undertook any duty of repairing the Bull Head. Indeed, the record discloses that the Bull Head progressively deteriorated while in Iowa Marine's possession to the point where it became a virtually worthless hulk; but no efforts were expended by Iowa Marine to enhance or restore its value by repairing the Bull Head in the absence of any request by Bull that the fleeting company do so. Under the circumstances, we find that the material, labor and

services rendered by Iowa Marine cannot be characterized as having for their purpose anything to do with "constructing, building, altering, repairing or ornamenting" the Bull Head. Accordingly, we hold that Iowa Marine was not entitled to a mechanics' lien on the Bull Head.

■■ We turn next to the chattel lien act (Ill. Rev. Stat. 1977, ch. 82, pars. 40 through 46), which was suggested as authority for Iowa Marine's right to foreclosure in the trial court's supplemental order of May 11, 1982, and in Iowa Marine's brief on appeal. Section 6 of "An Act for the better protection of any person, firm or corporation expending labor, skill or materials upon, or furnishing storage for, any chattel, creating a lien upon such chattel, and providing for the enforcement of such lien" provides a foreclosure remedy for the lienholder in the form of judicial sale, or in the event the owner elects to file a bond and reclaim possession of the chattel, a personal judgment may be rendered against the principal and sureties on the bond. (Ill. Rev. Stat. 1977, ch. 82, par. 45.) Although we are aware of no reported cases in which this act has been cited as authority for a lien on watercraft, we can perceive of no reason why it should not apply to the situation herein. In our opinion, the "fleeting" services provided by Iowa Marine for the Bull Head were primarily of safe storage, analogous to the services performed for the storage of motor vehicles by garage keepers. A fishing trawler is no less a chattel for purposes of this act than is a motor vehicle. Reasonable charges for "fleeting" the Bull Head are includable in determining the amount of Iowa Marine's lien. (See *Clifford v. Merritt-Chapman & Scott Corp.* (5th Cir. 1932), 57 F.2d 1021.) We hold therefore that Iowa Marine was entitled to a chattel lien on the Bull Head and the foreclosure remedy statutorily provided therefor. Unlike a mechanics' lien, however, a chattel lien confers no remedy for a deficiency judgment against the owner in the event a judicial sale fails to result in an amount sufficient to cover the lienholder's reasonable charges. Since Bull did not file a bond pursuant to section 6 of the act, the trial court's entry of a personal judgment against him cannot be sustained by force or the chattel lien act.

At the time of this action, there was also in effect "An Act to revise the law in relation to attachments of boats, vessels and rafts" (Ill. Rev. Stat. 1977, ch. 12, par. 1 *et seq.*). Although neither the parties nor the trial court appear to have considered the applicability of this act, we have. Our research, however, has been unavailing because it is firmly established that a personal judgment against the owner of a vessel is not permitted under the watercraft attachment act unless the owner files a bond (Ill. Rev. Stat. 1977, ch. 12, par. 15), which, as

aforesaid, was not done in the case before us. (See *Leddo v. Hughes* (1853), 15 Ill. 41; *Gindele v. Corrigan* (1889), 129 Ill. 582, 22 N.E. 516; and *Knapp, Stout & Co. v. McCaffrey* (1899), 178 Ill. 107, 52 N.E. 898.) Since the watercraft attachment act would have conferred no greater remedy than would be available to Iowa Marine under the chattel lien act, we need not consider further whether a claim might have been stated under that act.

Our analysis convinces us that the trial court's order should be affirmed to the extent that it established a lien in favor of Iowa Marine in the amount of $31,612.50. Insofar as a deficiency judgment was awarded as an adjunct to that lien, we reverse.

On appeal, Iowa Marine resists reversal of the personal judgment award entered in its favor claiming that, as alleged in its countercomplaint, an implied contract was formed when the services were performed for the Bull Head pursuant to custom and usage in the fleeting business.

In his brief, Bull states that judgment was entered against him on both Iowa Marine's foreclosure cause of action and its countercomplaint. This point is not argued by Iowa Marine. However, our review of the record reveals that the trial court specifically declined to enter judgment on both claims, stating for the record, "since the Counterclaim was consolidated with Cause 80 CH 535 [Iowa Marine's suit for foreclosure of lien], and since the Counterclaim in W 77 G 460 L [Bull's suit, *inter alia*, for conversion against Iowa Marine] is substantially the same as the Amended Complaint in Cause 80 CH 535, no order is entered as to the Counterclaim."

Where a lienholder produces proof of an express or implied contract, in addition to the remedies afforded by force of the lien, he may recover a personal judgment against the other party to the contract. If the trial court's entry of a personal judgment could be sustained on this basis, we would affirm that judgment even though the trial court may have awarded it as an incident of the lien itself.

Contracts are, by their nature, consensual agreements, legally binding on the parties thereto. (See Restatement (Second) of Contracts sec. 1 (1981).) An express contract is proved by an actual agreement or by the expressed words used by the parties. An implied contract is proved by circumstances showing that the parties intended to contract or by circumstances showing the general course of dealing between the parties. An agreement may be inferred from the acts or conduct of the parties instead of their spoken words (*In re Estate of Brumshagen* (1960), 27 Ill. App. 2d 14, 169 N.E.2d 112), thus giving rise to an implied contract where the evidence manifests one person's

tacit acceptance of the performance of valuable services by another. (*First National Bank v. Glenn* (1971), 132 Ill. App. 2d 322, 270 N.E.2d 493.) Tacit acceptance of benefits cannot be found, however, unless the evidence establishes that the person benefiting from the performance of labor and services has knowledge of such performance.

A party to a contract need not personally participate in its formation where he is represented by an agent. An agent may bind his principal contractually upon proof of the agency relationship and proof that the agent had authority to bind his principal in contract. Knowledge of the agent relative to the transaction is imputed to his principal. However, where an agent who is not so authorized enters into a contract on behalf of his principal, the principal may nonetheless be bound by ratifying the contract—accepting or retaining the benefits of it—upon proof that the principal electing to ratify had knowledge of all material facts surrounding the transaction. Restatement (Second) of Agency sec. 140 *et seq.* (1958).

With these principles in mind, we have reviewed the record to determine whether the trial court's entry of a personal judgment against Bull can be sustained under a contractual theory as suggested by Iowa Marine on appeal. The record contains no evidence of an express contract, oral or written. Nor is there any evidence of a course of dealing between Iowa Marine and Bull. Nonetheless, the trial court found that "the vessel was taken into the custody of Iowa Marine on June 20, 1976. Bull had knowledge of this, either directly or through his agent, Doyle." This factual conclusion could lend support to a finding of an implied contract if it is founded on the evidence. But it is not.

Bull admitted having observed the Bull Head while it was tied to the south bank of the river in Morris. The south bank was not posted so as to give notice of Iowa Marine's property interest. Bull denied any knowledge of Iowa Marine's involvement prior to late December of 1976. The record is devoid of any evidence to prove that Bull had personal knowledge that Iowa Marine had performed services for or claimed possession of the Bull Head at any time prior to December.

Les Doyle was an occasional employee of Edwin T. Bull, Sr. Doyle allegedly met the Bull Head shortly after it arrived in Morris and acted as watchman for a period prior to December of 1976. Doyle had died prior to the trial of this cause and his testimony was not available. The mere fact that Bull knew that the Bull Head was delivered to Doyle in Morris on June 20 does not, in our opinion, suffice to prove Bull's knowledge of Iowa Marine's performance of valuable services

for purposes of establishing an implied contract.

The record indicates that Edwin T. Bull, Jr., received a telephone call from Iowa Marine on June 23, 1976, relative to the fact that the Bull Head had been made a part of Iowa Marine's fleeting operations. Bull, Jr., allegedly said only that he'd "have to make some phone calls and *** get back." Jerry Stanton rode the Bull Head up from Pekin and requested the switching and towing services of the Maryellen on June 20, 1976. The record lacks evidence, however, to establish that any of these individuals, if agents of Bull, had any authority to enter into contracts binding on Edwin T. Bull, Sr., such that their personal knowledge of Iowa Marine's rendition of services for the Bull Head could be imputed to him. Although Iowa Marine mailed bills for its services, the evidence failed to establish that any of them were brought to the attention of Edwin T. Bull, Sr., prior to January of 1977.

In late December of 1976 the evidence is uncontradicted that Bull had actual knowledge that Iowa Marine was in possession of the Bull Head and was claiming charges for services. There is further evidence that on the same date Bull affirmatively rejected Iowa Marine's offer to continue to possess or to render any services for the Bull Head. Although the evidence of Bull's rejection was disputed by Oliver Brown, we cannot escape the conclusion that the manifest weight of the evidence indicates that, for purposes of Iowa Marine's counter-complaint on a theory of implied contract, Edwin T. Bull, Sr., neither expressly nor impliedly consented to any of the services performed by Iowa Marine on behalf of the Bull Head. Iowa Marine failed to establish any agency relationships between Edwin T. Bull, Sr., and the individuals with whom Iowa Marine dealt prior to December of 1976 such that the actual or constructive knowledge of those individuals could be imputed to Bull and thereby bind him contractually.

■ It does not appear to us that Edwin T. Bull, Sr., by offering to pay for switching services and fleeting services during the period in December of 1976, when the Bull Head was tied to the north shore of the river, thereby ratified agreements that may have been entered into by individuals purporting to act in Bull's behalf. The record is devoid of any proof that Bull had full knowledge of all material facts attending such agreements, if any. Under the circumstances here presented, we can find no basis upon which to sustain the trial court's award of a personal judgment for Iowa Marine against Edwin T. Bull, Sr.

The appeal in cause No. 82—343 is dismissed.

In cause No. 82—336, we vacate that portion of the trial court's

judgment which grants Iowa Marine's claim of a personal judgment against Edwin T. Bull, Sr. Judgment is hereby entered in favor of Edwin T. Bull, Sr., on Iowa Marine's countercomplaint. In all other respects, the judgment appealed from is affirmed.

Affirmed in part; reversed in part.

STOUDER, P.J., and ALLOY, J., concur.