GREENVIEW AG CENTER, INC., Plaintiff-Appellee, v. YETTER MANUFACTURING COMPANY, Defendant-Appellant.

Fourth District   No. 4—92—0861

Argued April 21, 1993.—Opinion filed June 10, 1993.

STEIGMANN, P.J., dissenting.

Linda L. Laugges (argued), of Keck, Mahin & Cate, of Peoria, for appellant.

Jerry Tice (argued), of Grosboll, Becker, Tice & Smith, of Petersburg, for appellee.

Leslie F. Kramer and Irwin Kass, both of Tomlinson, Gillman & Rikkers, S.C., of Madison, Wisconsin, for *amicus curiae* Midwest Farm Equipment Dealers Association.

JUSTICE McCULLOUGH delivered the opinion of the court:

Yetter Manufacturing Company (Yetter) appeals the trial court's order entering judgment in the amount of $8,183.62 in favor of Greenview Ag Center, Inc. (Greenview). The trial court found Yetter was obligated, pursuant to section 3 of the Illinois Equipment Fair Dealership Law (Fair Dealership Law) (Ill. Rev. Stat. 1991, ch. 5, par. 1503), to repurchase certain farm equipment and parts from Greenview. We affirm.

Greenview, a farm implement dealership run by David Cramer and Lyle Hunsley, had been in existence since the 1930's. Greenview had dealt with Yetter for approximately 14 years and had previously purchased various farm equipment from Yetter. Cramer explained that different pieces of equipment were bought at various times of the year depending on when in the season that particular piece of equipment would be used. He explained, for example, rotary hoes were usually sold between January and June and were used in May or June. Greenview kept Yetter parts in stock all year so they would be on hand if a farmer needed a specific part during the season. Glenn Rittenhouse was the Yetter representative with whom Greenview associated. Rittenhouse would call on Greenview monthly to take orders for whole goods. Greenview would order parts directly from Yetter.

In August 1990, Greenview elected to participate in Yetter's "Mega Rotary Hoe Program" (Program). This offer was extended to only 12 dealers throughout the State. Under the terms of the Program, a dealer was required to purchase a minimum of 40,000 pounds of rotary hoes and would receive a 10% discount for that purchase. The number of rotary hoes that would have to be purchased to meet this minimum poundage requirement would vary depending on the size of the equipment bought. The dealer could then sell the rotary hoes to other dealers or to the ultimate consumer. Dealers were required to take delivery of the rotary hoes in September and pay by December 1, 1990.

Rittenhouse explained that although rotary hoes are not used until May or June, Yetter needed a few months lead time after an order was placed to produce the rotary hoes. This is why the Program was offered in August, with September delivery, for equipment to be used approximately five or six months later. Furthermore, Yetter liked to actually have the rotary hoes in the hands of the dealers several months before the farmers needed them so the farmers could come in and examine them at the dealership.

Greenview ordered 12 rotary hoes and by December 1991 had sold all but five. Greenview terminated its dealership effective December 9, 1991. Pursuant to its termination, Greenview sent a letter to Yetter requesting it to repurchase the remaining rotary hoes from the Program pursuant to section 3 of the Fair Dealership Law. Yetter helped Greenview sell four of the remaining five rotary hoes. Yetter refused to repurchase the remaining rotary hoe and Greenview filed suit to compel the repurchase of that equipment plus other parts.

Following a bench trial, the trial court ruled in favor of Greenview. It found Greenview had "agreed to maintain an inventory of mega [*sic*] rotary hoes and Yetter parts, and when it terminated its agreement, [Yetter] was obligated by statute to repurchase the same from [Greenview] at [Greenview's] request." Judgment was entered for Greenview in the amount of $6,733.62 plus costs and attorney fees. The trial court noted:

> "[Yetter's] primary defense to this action is that it never agreed, nor did its representative agree, to buy back any left-over inventory of hoes from [Greenview]. [Yetter's] regional sales manager, Mark Seipel, testified that Yetter had no agreement with [Greenview] to buy back inventory. However, [Yetter] overlooks the entire purpose of the Act, which was to protect the retail dealer. Under the Act, if a retailer agrees to maintain an inventory and later terminates its agreement, the distribu-

tor/manufacturer *must* repurchase the inventory if the retailer so requires. His *agreement* to do so is not relevant. The statute mandates it. Furthermore, under [section] 1510, the Act may not be varied by contract or agreement and any attempt to do so is void and unenforceable." (Emphasis in original.)

Section 3 of the Fair Dealership Law provides:

"Whenever any retailer enters into a written or oral agreement with a wholesaler, manufacturer or distributor wherein the retailer agrees to maintain an inventory and the contract is terminated by wholesaler, manufacturer, distributor, or retailer, then the retailer may require the repurchase of the inventory as provided for in this Act." Ill. Rev. Stat. 1991, ch. 5, par. 1503.

Where statutory language is clear and unambiguous, a court must enforce the law as enacted without considering other aids of construction. (*People v. Drakeford* (1990), 139 Ill. 2d 206, 214, 564 N.E.2d 792, 796.) Judicial construction of a statute is necessary only when a statute is unclear or ambiguous. (*Buckellew v. Board of Education of Georgetown-Ridge Farm Community Unit School District No. 4* (1991), 215 Ill. App. 3d 506, 511, 575 N.E.2d 556, 559.) Where language of a statutory provision is clear, the court must give it effect. (*West v. Kirkham* (1992), 147 Ill. 2d 1, 6, 588 N.E.2d 1104, 1106.) The issue before us, then, is whether there was a written or oral agreement between Yetter and Greenview wherein Greenview agreed to maintain an inventory of rotary hoes.

Yetter raises two arguments in its contention that the trial court erred in finding in favor of Greenview. First, Yetter alleges the Fair Dealership Law does not apply to this situation because Yetter and Greenview did not enter into an express written or oral agreement to maintain inventory. Alternatively, Yetter maintains that if an implied agreement may be used to invoke the Fair Dealership Law, Greenview failed to establish that an implied agreement ever arose between the parties in which Greenview agreed to maintain inventory.

Greenview contends it entered into an oral agreement with Yetter by its participation in the Program, which by such participation, it agreed to maintain an inventory of the rotary hoes for the time period between January and June 1991. It further contends that only it and not Yetter had to agree that it would maintain inventory. Finally, Greenview asserts that if this court decides the Fair Dealership Law requires consent by Yetter for Greenview to maintain inventory, such consent can be inferred through the custom in the area and previous dealings between the parties.

Both Yetter and Greenview concede there was no express agreement, either written or oral, between them in which Greenview agreed to maintain inventory. Rittenhouse stated there was no express written or oral agreement to maintain inventory and there was no provision in the Program itself to buy back any inventory. Likewise, Cramer testified there was no express written or oral agreement to maintain inventory.

However, the facts presented in this case are sufficient to establish an implied agreement between Yetter and Greenview in which Greenview agreed to maintain an inventory. This implied agreement is evident from the terms of the Program, the course of dealing between the parties regarding the Program, and the custom and usage in this industry.

■ An implied-in-fact contract consists of obligations arising from an agreement where an agreement has not been expressed in words. The only difference between an implied contract and an expressed contract is that an express agreement is derived from an actual agreement, either verbal or written, and a contract implied in fact is inferred by a consideration of the facts and conduct of the parties. (*In re Marriage of Bennett* (1992), 225 Ill. App. 3d 828, 831, 587 N.E.2d 577, 580.) An implied contract is proved by circumstances showing the general course of dealing between the parties. An agreement may be inferred from the acts or conduct of the parties instead of their spoken words. (*Bull v. Mitchell* (1983), 114 Ill. App. 3d 177, 186, 448 N.E.2d 1016, 1023.) A term to be established as part of a contract by custom and usage of the trade must not be inconsistent with the other contract terms, must be well settled and uniformly acted upon. *Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc.* (1984), 127 Ill. App. 3d 589, 591-92, 469 N.E.2d 389, 392.

Under the terms of the Program, Greenview had to buy 40,000 pounds of rotary hoes and take delivery about six months before the ultimate purchaser would need the implements. As such, it was almost inevitable that it would not sell all of the rotary hoes. Mark Seipel, the Yetter representative, knew that some of the dealers who participated in the Program would carry over those hoes they did not sell into the next season. The number of rotary hoes a dealer could sell would vary from year to year depending upon the particular needs of the area farmers. Seipel testified there was no specific requirement to maintain inventory as a Yetter dealer. It was Yetter's goal to have its dealer sell out annually and start each new season with a fresh inventory.

■ Section 9—109(4) of the Uniform Commercial Code—Secured Transactions (Ill. Rev. Stat. 1989, ch. 26, par. 9—109(4)) defines "goods" as "inventory" "if they are held by a person who holds them for sale." Part of the comment to section 9—109 states:

> "The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale. Implicit in the definition is the criterion that the prospective sale is in the ordinary course of business." (Ill. Ann. Stat., ch. 26, par. 9—109, Uniform Commercial Code Comment, at 82 (Smith-Hurd 1974).)

Section 2(2) of the Fair Dealership Law defines "inventory" to include farm equipment, farm machinery, attachments, accessories and repair parts. (Ill. Rev. Stat. 1989, ch. 5, par. 1502(2).) Construing those two definitions together, the rotary hoes purchased pursuant to the Program, which were held by Greenview for immediate or ultimate sale, were inventory. However, because the terms of the Program required Greenview to purchase such a large number of rotary hoes, Yetter, knowing Greenview probably could not sell all of those rotary hoes, was in essence also requiring Greenview to *maintain* an inventory of rotary hoes. Similarly, by ordering 40,000 pounds of rotary hoes, Greenview obtained an inventory of rotary hoes out of which it filled its orders.

■ The course of dealing between the parties helps to establish an agreement in which Greenview agreed to maintain an inventory of rotary hoes. Cramer was told that if he did not participate in the Program, he would not be able to get any rotary hoes directly from Yetter later on if he desired to order one or two of these hoes because Yetter was only going to make as many rotary hoes as it had purchase orders for. If Greenview did not participate, and then later needed a rotary hoe, it would have to buy it from another dealer, presumably at a higher price resulting in less profit. In essence, Greenview had to participate in the program if it wanted the rotary hoes. By forcing Greenview to participate, Yetter created an inventory within the meaning of the statute. Ill. Rev. Stat. 1991, ch. 5, par. 1503.

■ Finally, the custom and usage of this industry supports the conclusion that the dealers would maintain an inventory of rotary hoes by participating in the Program. Frank Hofreiter was a part owner in a farm equipment dealership in Havana, Illinois. He participated in the Program in 1990 and 1991. When asked whether, by participating in this program, he agreed to maintain inventory of rotary hoes for Yetter during that farming season, he testified "[w]e had to

take [what] I call delivery and control inventory of it and stuff, yeah[, you had] to be able to have it."

Cramer attempted to explain why he believed he was required to maintain inventory. He testified:

"He [Rittenhouse] would imply to us or *** say to us, not imply but say to us, in fact we talked about this at great length on numerous conversations, even had phone conversations with somebody from Yetter that we're concerned about inventory on this many hoes. Well[,] don't be because Yetter isn't going to have hoes. They're only going to build those which they sell. Those were the things that were told to us in this manner and to me all of that is that you're going to maintain an inventory."

When asked whether he was specifically told he had to retain inventory in the Program, Cramer testified, "They did not say to you, you must maintain inventory. They'd say to you you buy this many hoes or there will not be hoes available." Seipel knew it would be unlikely that a dealer who participated in the Program would actually sell all of the rotary hoes. He also knew that the dealer who did not sell all of his rotary hoes would simply carry those over, presumably as inventory, until the next season.

Although not necessary to our resolution of the issue presented by this appeal, we find support for our decision in the legislative history of the Fair Dealership Law. The judicial role in construing statutes is to ascertain the legislative intent and give it effect. To aid in accomplishing this task, a court will seek to determine the objective the legislature sought to accomplish and the evil it desired to remedy. (*People v. Scharlau* (1990), 141 Ill. 2d 180, 192, 565 N.E.2d 1319, 1324-25.) That inquiry begins with the language of the statute and entails a consideration of the reason and necessity for the law, the evils to be remedied, and the objects and purposes to be obtained. (*People v. Garrett* (1990), 136 Ill. 2d 318, 329, 555 N.E.2d 353, 358.) To ascertain legislative intent, a court must first look to the language of the statute, examining that language as a whole, considering each part or section in connection with every other part or section. *Antunes v. Sookhakitch* (1992), 146 Ill. 2d 477, 484, 588 N.E.2d 1111, 1114.

■ The legislative intent behind the statute was to protect the independent farm equipment dealers who were being forced to purchase lots of expensive equipment and then being stuck with that equipment if their business failed. This is precisely the situation presented here. "[W]hen we initiated this law back in 1983, it was for the purposes of farm equipment and construction equipment to be able to be bought back for those dealerships through very tough times." (86th Ill. Gen.

Assem., Senate Proceedings, May 25, 1989, at 260 (statement of Senator Donahue).) In discussing whether to expand the Fair Dealership Law to include outdoor power equipment, Senator Hudson stated "perhaps we are expanding what started out to be a reasonable idea and that was protecting—as I understand it—retailers and dealers in times of economic trouble." 86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 264 (statement of Senator Hudson).

Moreover, the legislative history shows that the type of situation presented here was specifically envisioned by the senators. For instance, Senator Rigney stated:

"I think we must realize that many of these machinery dealers were encouraged by the manufacturer to tie up some rather substantial amounts of money in the various forms of inventory, whether it be in the form of the machinery itself or whether we're talking about the repair parts. It's absolutely mandated upon them that they tie up this kind of money if they are going to be a dealer within that system. *** What it does, it avoids the fire sale type of disposal that would have to take place if we did not have some type of buy-back provision." (83d Ill. Gen. Assem., Senate Proceedings, May 24, 1983, at 135 (statement of Senator Rigney).)

Senator O'Daniel noted:

"[A] lot of times dealers are required by companies to stock a large inventory, maybe a lot of stuff—of parts they—that don't move fast and probably they'll never sell. And if they ever decide to go out of business or anything, a lot of times they aren't fairly reimbursed for those." 86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 265 (statement of Senator O'Daniel).

Finally, in a motion taken with case, Greenview seeks its attorney fees incurred on appeal. Generally, attorney fees are not recoverable unless permitted by statute. (*People v. Johnson* (1981), 87 Ill. 2d 98, 107, 429 N.E.2d 497, 501; *Modern Mailing Systems, Inc. v. McDaniels* (1989), 191 Ill. App. 3d 347, 349, 547 N.E.2d 762, 764.) Statutes in derogation of the common law prohibition of attorney-fee awards to prevailing parties must be strictly construed. *Sutton v. Edgar* (1986), 147 Ill. App. 3d 723, 733, 498 N.E.2d 295, 302.

Section 8 of the Fair Dealership Law clearly allows for attorney fees incurred at the trial level. That section provides:

"If any wholesaler, manufacturer or distributor shall fail or refuse to repurchase any inventory as required by Section 4 of this Act, he shall be civilly liable for 100% of the current net

price of the inventory, plus any freight charges paid by the retailer, *the retailer's attorney's fees, and court costs*, plus interest at the statutory rate from date of shipment to wholesaler, manufacturer or distributor." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 5, par. 1508.)
The inquiry here is whether attorney fees and costs incurred on appeal should also be awarded.

In *Department of Public Works & Buildings v. Lanter* (1958), 15 Ill. 2d 33, 153 N.E.2d 552, the supreme court was faced with the issue of whether attorney fees incurred at the appellate level were recoverable by a prevailing party pursuant to section 10 of the Eminent Domain Act (see Ill. Rev. Stat. 1955, ch. 47, par. 10). In determining that those fees were recoverable under the facts of the case, the court stated:

"The plain intent of that provision is to pay defendants for all reasonable attorney fees incurred in defense of the condemnation petition under the circumstances specified in section 10. Where that defense must be made, not merely in the trial court, but also in a reviewing court because the Department has taken an appeal to that court, and defendant has no choice in the matter, then the attorney fees incurred in connection with that appellate court proceeding must be deemed to be an integral part of the defense of the condemnation petition, and should be recoverable under the statute. Where, however, the appeal is taken by the defendant property owner, and the choice of proceeding in another court is his, then the legal services in that court need not be regarded as an integral part of the defense of the condemnation petition, and the fees for such services should not be compensable under the statute." *Department of Public Works & Buildings*, 15 Ill. 2d at 40, 153 N.E.2d at 556.

■ Although a different statute was involved in that case (Ill. Rev. Stat. 1955, ch. 47, par. 10) than in the case presently on appeal, the rationale is applicable here and supports Greenview's argument that it should be awarded its attorney fees incurred at this level. The specific terms of the statute allow for attorney fees incurred at the trial level. Since Yetter has taken an appeal, Greenview had no choice except to defend the trial court's decision in its favor. Thus, its attorney fees incurred on appeal must be deemed to be an integral part of its defense under the Fair Dealership Law. As such, those fees are recoverable under section 8 of the Fair Dealership Law.

For the foregoing reasons, the judgment of the circuit court of Menard County is affirmed. In addition, Greenview's motion for attorney fees and costs on appeal is granted, and the cause is remanded to the trial court for a hearing on the amount of attorney fees and costs reasonably expended by Greenview in defending this appeal.

Affirmed and cause remanded with directions.

COOK, J., concurs.

PRESIDING JUSTICE STEIGMANN, dissenting:
I respectfully dissent.

Although the majority opinion does a fine job of constructing an argument that the agreement between Greenview and Yetter required Greenview "to maintain an inventory," I believe in the final analysis that argument falls short. The question that I think must be answered before we can affirm this judgment is the following: If Greenview had unexpectedly sold all of the 40,000 pounds of rotary hoes that it ordered from Yetter, would it have been contractually obligated to purchase more in order "to maintain an inventory?" Because I think the answer clearly is no, I believe we must reverse the trial court, finding that section 3 of the Fair Dealership Law does not apply to this case.

In my view, the statute in question is really a "showroom statute." It is designed to address a situation in which a manufacturer requires a dealer to keep the manufacturer's product in the dealer's showroom so that prospective purchasers can see it, touch it, and "kick the tires" (so to speak), as opposed to merely looking at a photograph of the product. The statute was designed to protect the dealer whose contract with the manufacturer required the dealer "to maintain an inventory," so that the manufacturer would be required to buy back the inventory the manufacturer contractually required the dealer "to maintain."

All that happened in the present case is that Yetter Manufacturing offered Greenview a good deal on a large volume of Yetter's product, namely, a quasi-exclusive sales arrangement plus a 10% discount on the purchase price. After the fact, Greenview comes to the courts, arguing the commercial-law-equivalent of, "Stop me before I kill again." Greenview really is arguing that the courts need to protect it from a deal it voluntarily entered into. We should decline and leave free market forces alone. No one held a gun to Greenview's head to get it to make this deal with Yetter, and Greenview should be stuck with the deal it made.