# In the
# United States Court of Appeals
## For the Seventh Circuit

——————

No. 03-3337

IN RE: MIDWAY AIRLINES, INC.,
MIDWAY AIRLINES (1987) and
MIDWAY AIRCRAFT ENGINEERING, INC.

*Debtors-Appellees.*

MONARCH AIR SERVICE, INC.,

*Defendant-Appellant,*

v.

SHELDON L. SOLOW, Trustee,

*Plaintiff-Appellee.*

——————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CV 2580—**John A. Nordberg**, *Judge.*

——————

ARGUED FEBRUARY 12, 2004—DECIDED SEPTEMBER 13, 2004

——————

Before CUDAHY, COFFEY and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Unfortunately lacking a crystal ball, in August 1990, defendant Monarch Air Service, Inc. (Monarch) entered into an agreement with Midway Airlines, Inc. (Midway) to provide fueling services for Midway's aircraft. These services included, among other things, the management of Midway's fuel storage tank farm. By March 1991, Midway and two related entities, Midway Airlines

(1987) (Midway 1987) and Midway Aircraft Engineering, Inc. (Midway Engineering) (collectively, the Midway debtors) filed for Chapter 11 bankruptcy. Monarch was required by the bankruptcy court, together with other vendors, to continue providing services to the ailing Midway Airlines. Alas, Midway's financial situation took a turn for the worse, and by November 1991, Midway unilaterally (and without notice) ejected Monarch from the tank farm, converting to a Chapter 7 bankruptcy two weeks later.

In January 1992, the bankruptcy court authorized the sale of the jet fuel stored in Midway's tank farm. Monarch belatedly realized that this was a perfect opportunity to assert claims that both its pre-petition and post-petition expenses were actually secured by a common law bailee's or warehouseman's lien on the jet fuel. The sale of the jet fuel went forward, and the disputed amount of the proceeds has been held in escrow ever since.

Eventually, it came time to dispose of the remaining smaller claims against the Midway debtors, including Monarch's claims. Monarch consented to the disallowance of its claim for pre-petition expenses. The amount in dispute at the present juncture is Monarch's claim for post-petition expenses of $36,938.60. The bankruptcy court found that Monarch had consented to the treatment of its post-petition claim as an unsecured administrative expense, and, in the alternative, that Monarch was not entitled to a lien on the jet fuel in the first place. The district court affirmed on the first ground, ignoring the second. Monarch appeals both of the bankruptcy court's findings, but for the reasons that follow, we affirm.

## I.

The facts in this case are essentially undisputed. Monarch entered into an airport fueling services agreement with Midway on August 28, 1990 (1990 Contract). (R. 1-1, tab A.) According to this agreement, Monarch's responsibilities

were twofold: supplying fueling services for Midway's aircraft at Midway airport (which included refueling and defueling the aircraft and transporting the fuel from Midway's tanks to its aircraft in Monarch's own tanker trucks), as well as managing Midway's fuel storage tanks (which consisted of operating the fuel tanks in connection with providing fueling services and routine maintenance of the tanks). The agreement stated that all fuel would be ordered, purchased and owned by Midway. It also provided that the fuel tank facilities in which Midway's fuel was stored were owned by the City of Chicago and leased to (and controlled by) Midway. Midway has, however, admitted that Monarch had sole physical possession and control over the fuel tank facilities pursuant to the contract. (Appendix 11, Trustee's Rule 402(N) Response, #12.) The agreement gave Midway the option of assuming management of its storage facilities upon thirty days' written notice to Monarch.

On March 25, 1991, the three Midway debtors filed voluntary Chapter 11 bankruptcy petitions. In accordance with these petitions, the Midway debtors obtained an injunction barring key vendors, such as Monarch, from suspending services under their contracts. The order imposing the injunction provided that "each such defendant or party which . . . otherwise provides goods or rendered services as requested by the plaintiffs pursuant to the Industry Agreements on or after March 26, 2001, shall be entitled to payment therefor in the ordinary course of business, as an administrative expense under 11 U.S.C. § 503(b)(1)." (Loose Pldgs. 1-1, Exhibit B.) Monarch filed an initial proof of an unsecured claim for pre-petition services of $75,645 on June 18, 1991 (Initial Claim). (Trustee's Br., Supp. Appx., tab B.)

On November 13, 1991, without any notice, Midway removed Monarch from physical possession of and control over the fuel tank facilities. At this point, Monarch was owed approximately an additional $37,000 for its post-pe-

tition services. About two weeks later, Midway and Midway Engineering converted their Chapter 11 petitions to Chapter 7 bankruptcies; Midway 1987 followed suit on March 9, 1992.

Meanwhile, the bankruptcy court had entered an order on January 27, 1992, authorizing the sale of the fuel inventory in Midway's storage tanks, providing that "Liens, including warehousemen's liens and possessory liens, shall attach to the proceeds." Monarch did not receive actual notice of this order until March 1992, at which time it informed the trustee of the Midway debtors' bankruptcy estate, plaintiff Sheldon Solow (Trustee), that it held a possessory lien in the proceeds of the sale. The disputed proceeds were placed in escrow pending determination of the validity of Monarch's claimed lien. More than 12 years later, these proceeds continue to be held in escrow.

On April 29, 1992, Monarch filed two proofs of claim. One claim purported to amend its Initial Claim by asserting that Monarch's pre-petition expenses of $75,645 were secured by a common law bailee's or warehouseman's possessory lien on the jet fuel in Midway's fuel storage tanks and Monarch's tanker trucks (Claim One). (Trustee's Br., Supp. Appx., tab D.) The other claim was for expenses of $112,583.19, which included both Monarch's pre-petition expenses of $75,645 and its post-petition expenses of $36,938.60 (Claim Two). (Trustee's Br., Supp. Appx., tab E.) Like Claim One, these expenses were also said to be secured by a common law bailee's/warehouseman's possessory lien on the jet fuel in Midway's fuel storage tanks and Monarch's tanker trucks. However, on the same form, Monarch also expressed an intent to claim (in the alternative) that the $36,938.60 was a priority (unsecured) administrative expense as provided under the terms of the March 26, 1991 order. The bankruptcy court, in an order entered May 18, 1993, allowed Monarch's post-petition claim in full as an administrative expense under 11 U.S.C. § 503. (Trustee's

Br., Supp. Appx., tab C.) No mention was made of any secured status for this claim.

After nearly eight years had gone by, the bankruptcy court, upon the Trustee's motion, approved a claims resolution procedure authorizing the Trustee to use a negative notice format to resolve the remaining 11,000 or so claims by the creditors of the Midway debtors. Pursuant to this procedure, the Trustee sent notices to the persons designated to receive notices on Monarch's Claim One and Claim Two forms—Monarch's president and Monarch's general counsel, respectively. The Trustee's notice of objection to Claim Two, served on Monarch's general counsel in July 2001, is the one at issue here. (Trustee's Br., Supp. Appx., tab H.) This notice proposed to allow the post-petition amount of $36,938.60 in full, with the caveat that "Your distribution will be a percentage of your Allowed Amount." The notice objected to the portion of the claim for pre-petition services, stating that "[n]o distribution will be made to pre-petition claims because the Estate lacks funds to pay all post-petition claims in full." No explicit mention was made whether the Allowed Amount ($36,938.60) was being treated as an administrative expense or as a secured post-petition expense. Monarch's president signed and returned a consent form agreeing to this treatment dated August 3, 2001. A second notice objecting to Claim One as being both pre-petition and duplicative was sent in May 2002 directly to Monarch's president (Trustee's Br., Supp. Appx., tab K), and no response was filed.[1]

On February 5, 2003, the bankruptcy court issued an oral ruling that Monarch had consented to the treatment of its proof of secured post-petition claim as an administrative expense and entered summary judgment in the Trustee's

---

[1] Monarch therefore consented to the Trustee's treatment of Claim One.

favor. Monarch filed a motion for reconsideration the next day, which was denied on February 24, 2003 when the bankruptcy court confirmed its holding that Monarch had waived its secured claim to post-petition expenses, and, in the alternative, that Monarch did not, in any event, have a valid post-petition lien entitling it to secured status.

On March 6, 2003, Monarch appealed to the district court, which by order dated July 30, 2003, affirmed the bankruptcy court's grant of summary judgment to the Trustee on the ground that Monarch had waived its alleged secured claim. Monarch subsequently appealed to this court.

## II.

A court of appeals applies the same standard of review to bankruptcy court decisions as does a district court. A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. *In re Smith*, 286 F.3d 461, 464-65 (7th Cir. 2002) (internal citations omitted). As a conclusion of law, a grant of summary judgment by the bankruptcy court is therefore reviewed de novo. A grant of summary judgment will be affirmed if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be affirmed on any ground supported by the record, even if it was not relied upon by the court below. *Johnson v. Gudmundsson*, 35 F.3d 1104, 1115 (7th Cir. 1994).

The issues in this case boil down to two questions: (1) Did the bankruptcy court and the district court properly find that Monarch had waived its secured claim for post-petition expenses against Midway? And (2), did the bankruptcy court properly find that Monarch had failed to establish the existence of a valid post-petition lien?

**A.**

In the 2003 proceedings, both the bankruptcy court and the district court found that Monarch had impliedly waived its post-petition secured claim by consenting to the Trustee's treatment of Claim Two. The bankruptcy court found that Monarch had consented to the treatment of its post-petition claim as a straight (unsecured) administrative claim, which was indicated by the bankruptcy court's May 18, 1993 order and by the language of the Trustee's objection to Claim Two, served in July 2001. (*See* Monarch's Short Appx., tab 1, at 6, 10.) The bankruptcy court additionally pointed out that the consent form, signed by Monarch's president and dated August 3, 2001, stated that Monarch would receive a percentage of the allowed amount, which is typical of regular (unsecured) administrative expenses when the bankruptcy estate is administratively insolvent. *See id.* at 12.

The district court agreed that the language of the objection indicated that the post-petition expense was being treated as an unsecured administrative expense and that the lack of any mention of a lien in the Trustee's objection form indicated that the Trustee was not proposing to allow the claim as a secured expense. (*See* Monarch's Short Appx., tab 5, at 12.) The district court also agreed with the bankruptcy court that Monarch unreasonably continued to rely on its proof of claim, filed more than eight years earlier, to maintain a secured claim in the face of the negative notice procedure being used and the language of the objection notice referring to recovery of a "percentage" of the allowed amount.

Monarch argues on appeal that it asserted a secured claim to administrative expenses in Claim Two, and that 11 U.S.C. § 502(a) and the Federal Rules of Bankruptcy Procedure 3001(f) provide that the proof of claim is prima facie valid and the claim is deemed allowed unless the

Trustee objects in writing. The bankruptcy court's May 18, 1993 order is said not to have addressed the secured status of Monarch's administrative expense claim. Moreover, Monarch argues, the Trustee did not address the secured status of its post-petition claim in its objection to Claim Two, and the "percentage" language in a footnote to the objection notice should not be considered to be a written "objection" that placed Monarch on notice that its secured claim was being treated as an unsecured administrative expense. On this point, Monarch further argues that being told it would receive a "percentage" did not necessarily indicate that its claim was being treated as unsecured rather than secured, since it is possible for secured claimants to receive a percentage of their claims in certain circumstances.

Let us begin with a brief explanation of the types and priorities of claims, which may be helpful here. Secured claims are paid (or the collateral returned) before any distribution is made to priority claimants or to unsecured general creditors. 11 U.S.C. § 725. The Bankruptcy Code defines several categories of priority claims in § 507, all of which are paid out after secured creditors have received their funds. *Id.* at § 726. General unsecured creditors receive a distribution from the bankruptcy estate only if any funds remain after all priority claims have been paid.

Among priority claims, administrative expenses receive the top priority. *Id.* at § 507(a)(1). Typically, administrative expenses are unsecured, due perhaps to the operation of 11 U.S.C. § 362(a)(4)'s automatic stay, which bars any entity from "any act to create, perfect, or enforce any lien against property of the estate." There are a few possible exceptions, such as in the case of extensions of post-petition credit in accordance with 11 U.S.C. § 364(d), or, as some courts have found, in the case of *ad valorem* real estate taxes, *see City of New York Dept. of Finance v. R.H. Macy & Co., Inc.*, 176 B.R. 315 (S.D.N.Y. 1994). These are usually classified as

"superpriority" administrative expenses and are paid out before "regular" administrative expenses.[2] Although the bankruptcy court here found § 362(a)(4)'s automatic stay inapplicable to liens created by operation of law, a finding with respect to which we render no opinion, this does not change the fact that a reference to "administrative expenses" without any indication of superpriority or secured status will typically refer to unsecured administrative expenses.

Turning to Monarch's claims, Claim Two (the claim at issue here) asserted a secured claim for Monarch's pre- and post-petition expenses of $112,583.19. In the alternative—presumably as a fall-back position if its lien were found invalid—Monarch asserted an unsecured claim to priority administrative expenses of $36,938.60 pursuant to the bankruptcy court's March 26, 1991 order. (Trustee's Br., Supp. Appx., tab E.) The March 26, 1991 order did not indicate that a creditor's entitlement to administrative expenses under 11 U.S.C. § 503(b)(1) for provision of post-petition goods or services would (or could) entitle it to anything other than regular unsecured administrative expenses. (Loose Pldgs. 1-1, Exhibit B.) Given, as we have discussed, that administrative expenses generally refer to unsecured expenses, when the bankruptcy court allowed Monarch's post-petition claim in 1993 as an administrative expense pursuant to 11 U.S.C. § 503(b)(1) without any mention of secured status or of Monarch's purported lien, this action served to allow the claim as a typical unsecured administrative expense. Implicit in this decision was the bankruptcy court's non-acceptance of Monarch's secured claim to post-petition expenses.

---

[2] A creditor may also claim "superpriority" administrative expenses when it has been granted "adequate protection" of its collateral but the adequate protection fails. *See* 11 U.S.C. § 507(b).

Moreover, the bankruptcy and district courts correctly held that the Trustee's objection to Claim Two clearly implied that Monarch's post-petition claim would be treated as an unsecured administrative expense. First, there is the footnote on the objection notice indicating that Monarch would receive a percentage of its claim for post-petition expenses, a comment that the bankruptcy court observed to be typical of unsecured administrative expenses. Second, there is the Trustee's statement that "[n]o distribution will be made to pre-petition claims because the Estate lacks funds to pay all post-petition claims in full." This language indicates that Monarch's pre-petition claim was of a lower priority than claims for post-petition administrative expenses. If the Trustee had accepted Monarch's claimed lien as valid, Monarch's pre-petition expenses would have been allowed in full because they were secured, rather than being given a lower priority than post-petition administrative expenses.[3]

In light of the aforementioned circumstances and the eight long years that passed without any indication from Monarch that it was continuing to assert a secured claim for its post-petition expenses, the Trustee was entitled to assume that Monarch's secured claim was no longer viable and that the Bankruptcy Code's dual presumptions of validity and allowability with respect to this claim had been overcome. Moreover, the Trustee's objection to Claim Two clearly implied that Monarch's pre-petition and post-petition claims were being treated as unsecured. Thus, the bankruptcy and district courts correctly held that the onus

---

[3] *See United States v. Darnell (In re Darnell)*, 834 F.2d 1263, 1265 (6th Cir. 1987) ("[A]s a general rule, if a lien is perfected, it must be satisfied out of the asset(s) it encumbers before any proceeds of the asset(s) are available to unsecured claimants, including those having priority (such as holders of administrative claims).") (citing 3 Collier on Bankruptcy para. 507.02[2] (15th ed. 1985)).

was on Monarch to reassert the secured status of its claim for post-petition expenses in the face of the Trustee's objection, and Monarch failed to do so. Monarch's consent to the Trustee's objection to Claim Two was a consent to the treatment of its post-petition claim as regular (unsecured) administrative expenses.

Monarch's contention that a hearing is necessary to determine whether its consent to the Trustee's objection was an intentional relinquishment of its claimed lien is without merit. Monarch's designated recipient of bankruptcy notices relating to Claim Two was not "akin to a corporation's registered agent" or some other unaffiliated entity (Monarch's Br. at 31), but rather was Monarch's own general counsel. And Monarch's general counsel would have been remiss in his obligation to the corporation if he had merely received important legal notices such as the Trustee's objection to Claim Two and forwarded them to Monarch's president without advice or comment. This is true even if the advice consisted of simply advising Monarch's president to consult with specialized bankruptcy counsel before signing the consent form. It is true that a waiver is an intentional relinquishment of a known right. *See Kontrick v. Ryan*, 124 S. Ct. 906, 917 n.13 (2004). But we have held that the Trustee's written objection was a clear treatment, even if by implication, of Monarch's post-petition claim as an unsecured administrative expense.

If Monarch's president considered himself insufficiently well-versed in the intricacies of bankruptcy matters to know what he was consenting to, he was surely, as a senior corporate executive, sufficiently sophisticated to know that he should consult with, at minimum, the company's general counsel. Monarch's president was given the opportunity to obtain the knowledge required for an informed consent to the Trustee's objection when that written notice of objection was sent to Monarch's general counsel. Due process certainly does not require that there be a warning to consult

counsel before giving one's consent to the proposed treatment of a bankruptcy claim. And consent is not rendered ineffective by the failure of a corporate executive to obtain competent advice on bankruptcy matters. Any strategic errors made by Monarch or its agents in pursuing its bankruptcy claims are not for us to redress.

**B.**

However, even if Monarch had not consented to the treatment of its post-petition expenses as an unsecured claim for administrative expenses, we would still conclude that Monarch did not have a lien securing this claim and that summary judgment was correctly granted to Midway. At Illinois common law,

> [a] bailment is defined as "the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose has been fulfilled they shall be redelivered to the bailor, or otherwise dealt with according to his directions or kept [until] he reclaims them." The elements necessary for a bailment include (1) "an agreement by the bailor to transfer or deliver and the bailee to accept exclusive possession of goods for a specified purpose"; (2) "the actual delivery or transfer of exclusive possession of the property of the bailor to the bailee"; and (3) "acceptance of exclusive possession by the bailee."

*Spirit of Excellence, Ltd. v. Intercargo Ins. Co.*, 334 Ill. App. 3d 136, 147 n.1 (Ill. App. Ct. 2002) (citations omitted).

The bankruptcy court found that Monarch had "arguably satisfied the three elements of a bailment" but found that doing so "did not automatically give rise to a lien." (Monarch's Br. at 37.) The bankruptcy court found that Monarch did not meet the requirements for an artisan's lien (which is a particular form of bailee's lien) as set out in *Lake River v.*

*Carborundum Corp.*,[4] because although "Monarch certainly provided a service to the debtors, . . . it did not add any value to [the] jet fuel, the property upon which [it] asserts a lien." (Monarch's Short Appx., tab 3, at 12.)

Monarch argues that at Illinois common law, a lien may still be had based on the labor or services furnished by the bailee. "The right to a lien for . . . services arises upon the furnishing of such . . . services and by force of a statute, an express contract, an implied contract or the usages of trade or commerce. The right to retain possession of the property to enforce a possessory lien continues until such time as the charges for such . . . services are paid." *Bull v. Mitchell*, 114 Ill. App. 3d 177, 181 (Ill. App. Ct. 1983). This is true even where that labor does not result in increased market value. *See Chicago G.W.R. Co. v. American McKenna Process Co.*, 1916 WL 2228, *2 (Ill. App. Ct. 1916) ("Appellant argues that judgment on this plea is bad because the rehandling did not enhance the value of the rails, and a lien only exists where the work of a laborer enhances value. This is true as a rule, but in applying it, 'value' does not always mean market value."); Restatement (First) of Security § 61, cmt. (d).

Although Monarch has made an argument that could be persuasive under certain circumstances, it does not work here. Monarch's line of reasoning fails at the very first step: the establishment of a relationship giving rise to a lien. Let us review what took place with respect to Midway's jet fuel in accordance with Midway's contract with Monarch. Midway arranged for jet fuel to be delivered to its fuel tank storage farm. Monarch provided basic management services for Midway's tank farm and was responsible for transportation of the jet fuel between Midway's tank farm and Midway's

---

[4]   769 F.2d 1284 (7th Cir. 1985).

aircraft for refueling/defueling.[5] Although Monarch admittedly had "possession and control" over Midway's tank farm, this does not mean that the jet fuel was delivered *to Monarch* when it was put into the storage tanks, since Monarch did not own or lease the storage tanks. Nor was the jet fuel delivered to the fuel tanks "for some purpose" that Monarch was to fulfill (e.g., storage). The "purpose" of Monarch's services with respect to the fuel in the storage tanks was merely basic management of the tank farm; Monarch was not required to do anything with or to the jet fuel while it was stored in Midway's tanks.

Monarch is essentially arguing that it is entitled to a lien for management services. But Monarch's argument that a bailment of Midway's jet fuel was created by virtue of Monarch's possession and control over Midway's fuel tanks fails; Monarch's role with respect to the fuel tanks is that of an agent. We do not believe that Monarch has demonstrated that what occurred when the jet fuel was placed in Midway's tanks was "the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose

---

[5] To the extent that Monarch's lien is claimed to arise from the provision of transportation services and is said to attach to the jet fuel in Monarch's trucks, we note that Monarch was not acting as a common carrier in its provision of transportation services. If it were, there would be a carrier's lien for payment of freight. But since Monarch's provision of transportation services was not in the capacity of a common carrier, Monarch is not entitled to a possessory lien at common law for transportation services. *See* Restatement (First) of Security § 61, cmt. (g) (1941) ("Private carriers have less onerous duties and responsibilities [than common carriers] and have no possessory liens unless granted by contract or statute."). Monarch's contract with Midway does not provide for any possessory liens, and Monarch has not asserted any statutory liens, so it is not entitled to a lien on the fuel in its trucks to pay transportation charges.

has been fulfilled they shall be redelivered to the bailor."
*Spirit of Excellence*, 334 Ill. App. 3d at 147 n.1. Monarch's
management of the fuel tank farm in which the jet fuel was
stored did not, after all, purport to impact the jet fuel
directly and is not among those services recognized at
common law as giving rise to a possessory lien.[6] *Cf.* Restate-
ment (First) of Security § 61 (1941) ("The service necessary
to create a lien is limited to work actually performed upon
the chattel itself. There is no lien for intellectual labor
although it may have been wholly confined to the chattel as
a subject. Thus an art expert to whom a painting has been
delivered for appraisal and opinion cannot retain the
painting as security for his fee, in the absence of a special
contract for a lien.").

Thus, under the circumstances of this case, Monarch has
not demonstrated that a bailment ever took place. There
was no delivery of goods into Monarch's possession for some
purpose to be served—at least, no purpose recognized by the
common law as giving rise to a possessory lien for services.
We agree with the bankruptcy court that Monarch is not
entitled to a lien on the jet fuel, and there is therefore no
basis for Monarch's secured claim for its expenses, either
pre-petition or post-petition.

---

[6] Those circumstances/services recognized as giving rise to enti-
tlement to a possessory lien include: (1) "a bailee who at the re-
quest of the bailor does work upon or adds materials to a chattel"
(which does not necessarily require the chattel's market value to
increase); (2) transportation of a chattel by a common carrier; (3)
a hotelkeeper; (4) storage of a chattel provided by a warehouse-
man; (5) finding a chattel for which a specific reward is offered; (6)
sale of a chattel, if the seller is in possession; (7) advancing money
or incurring liability by an agent on behalf of his principal in
respect of a chattel in his possession; (8) a landlord who enters
and seizes chattels in the tenant's possession after a default on
rent; and (9) a possessor of land who seizes a thing doing damage
on the land. Restatement (First) of Security § 61 (1941).

### III.

We are, frankly, somewhat baffled by Monarch's pursuit of this appeal, given the high costs of litigation and the relatively small amount in dispute. But although we cannot explain Monarch's litigation strategy, we can express a hope that the resolution of this claim will bring Midway Airlines one step closer to terminating its long-standing bankruptcy estate. For the reasons stated above, the district court is AFFIRMED.


A true Copy:

      Teste:


                     _____
                     *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*